UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

**CHRISTOPHER SALDIVAR,**

      **Plaintiff,**

v.                                       **Case No. 2:11-cv-00424**

**AVI FOODSYSTEMS, INC.,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action alleging employment discrimination, tortious interference and defamation filed by the plaintiff, a natural-born United States citizen who is Mexican American, after he was terminated by the defendant for alleged distribution of prescription painkillers to other employees at work. The plaintiff's complaint was filed in the Circuit Court of Kanawha County, West Virginia and removed to this court by the defendant (ECF No. 1). The plaintiff is proceeding *pro se*; thus the case was referred to the undersigned for submission of proposed findings and recommendation for disposition (ECF No. 2). The court conducted a status and scheduling conference with the parties to confirm the plaintiff's ability to pursue this litigation and his familiarity with the Federal Rules of Civil Procedure (ECF No. 13). Following a discovery period which included the plaintiff's deposition, the defendant filed a Motion for Summary Judgment (ECF No. 40), supported by exhibits and a memorandum (ECF No. 41). The court issued a *Roseboro*[1] notice to the plaintiff (ECF No. 42). The plaintiff filed a

---

[1] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

response with attached affidavits (ECF No. 45), and the defendant filed a reply (ECF No. 46).

## Background and Undisputed Facts

AVI Food Systems, Inc. ("AVI") has a contract with West Virginia State University ("WVSU") in Institute, West Virginia, to operate food vending services and dining facilities. The plaintiff worked for AVI at WVSU, in positions of responsibility, from August 12, 2003 until March 29, 2010, when he was terminated.

On March 11, 2010, the plaintiff's wife, Julie Saldivar, contacted Chief Joseph Saunders, Director of Public Safety at WVSU, to ask for assistance with her son Gabriel Ambriz, who was then employed by AVI. Mrs. Saldivar, who is employed by WVSU, was concerned that Gabriel Ambriz was addicted to prescription painkillers. She told Chief Saunders that another AVI employee, Robert Todd Lamb, had given Ambriz prescription pain medication at work.

Chief Saunders interviewed Ambriz and Lamb and they provided written statements concerning their involvement in the distribution of prescription painkillers among some AVI employees. Mr. Lamb's statement reads as follows [spelling and punctuation corrected]:

> On Monday, 3-1-10, David [Sayre] was buying 25 10 milligrams Lortabs from Chris Saldivar for $200.00 Dollars. David keep 5 & gave 5 to Von [Vaughn Jarrett] & 5 2[to] me. I gave 6 to Rod Martin. 3-2-10 Gabe called my son James and got my phone #. He called me and said do I have Mexican jumping beans and I said no. On Friday 3-5-10 at the café, I Todd Lamb gave Gabe a 5 milligram so he would leave me alone. He said is that the best u got. I said yes. Gab there no good. On 3-10-10 Rod Martin gave me back the 6 he got from me or the pink ones I got from Chris. Chris told David not 2 tell me he got them from Chris. He Chris owes me 5 for years. When I'm in pain I ask Chris for 1 he said 8 dollars I said no thanks. Chris owes me 5 for years. Gab said that he's been getting Lortabs from Rod & Chris for years that's the problem. Sometime in the end of February Rod caught someone else giving Gabe something and Rod said I don't care

2

what you do outside of the cafeteria but don't do it here.  When David gave a prescription bottle with 15 Lortabs in it, it had Chris Saldivar's name on it.  Chris told David to make sure Rod didn't see the pink Lortabs because he would know they came from him (Chris).  Chris asked me if I got anything the same day he sold David the pink ones.  /s/ Robert T. Lamb (dated March 11, 2010).

(ECF No. 40-8, at 4-5.)

Gabriel Ambriz gave the following statement, dated March 11, 2010:

Todd [Lamb] and I talked about pills.  He said he had got them for his back.  So we continued to work.  I then went into the cooler and was getting something for Rod.  Then Todd walked up and gave me one single pill.  After that we both continued to work out the rest of the day.  We were talking about the pills while we were working.  And that's how I came to find out that he had pills.  And I'm sorry for bringing shame to my family.  And the State Police will never hear of another incident like this again.  And it is my deepest apologizes for all this ever happening.  When he gave me the pill I took it, and it made me feel high.  The pill was orange in color.  And had a little V on it.  This all took place while at work.  The name of the pill was a Lortab but I don't know the milligrams.

*Id.* at 7-8.

On March 15, 2010, Chief Saunders interviewed and obtained statements from David Sayre and Vaughn Jarrett.  David Sayre's written statement reads as follows [spelling and punctuation corrected]:

Chris approached me one day and showed me a pink Lortab 10 and asked me how much I could get out of them.  I told him 8 dollars so he said he could sell me 25.  I told Todd about it and he gave me the money and I purchased them from Chris and took them to Todd and Vaughn also gave me money for 5 and then 2 weeks later Todd gave me the money again and I bought 20 off Chris and gave them all to Todd.  Vaughn told me Chris used to sell him the pills for 6 and I cut him out.  The other day me and Todd went to Cedar Grove on my break and he purchased 20 yellow Lortabs off my childhood friend, Wayne Harrison, and Gabe sent 40 $1 with us for 5 of them and Todd said he would get them to him and he did.  Back in November, I sold Gab 3 Lortabs.  Rod and Chris called me into the office and said do not sell or give Gab any pills he has a problem.  Since that day I have not, even though Gab would approach me every day looking for pills.  Thursday a week ago Todd purchased 60 Xanaxes off a guy named Ralph and he wanted to trade them for Lortabs.  I don't know if

3

> he did but he gave me 13 of them and I took them and went to work acting crazy and got sent home.  /s/ David Sayre

*Id.* at 9-10.

Vaughn Jarrett's statement reads [spelling corrected]:

> I bought pink Vicodin 4 from Chris Saldivar.  I paid $7 each at a total of 30 or 28 – something like that.  That has been weeks ago.
> I bought 5 pink Vicodin from Dave about a week ago.  I paid eight dollars each, the total being $40.00.  /s/ Vaughn Jarrett[2]

*Id.* at 12.

Chief Saunders attempted to interview the plaintiff, who stated, "I don't know nothing.  I know I didn't do anything.  I know that I never did anything – nobody – nothing."  (ECF No. 40-3, Saldivar Depo., at 182.)

Chief Saunders provided copies of the witnesses' statements to AVI.  District Manager Deborah Savage reviewed the statements and contacted each of the witnesses to verify the accuracy of their statements.  Messrs. Lamb, Ambriz, Sayre and Jarrett confirmed the substance of their statements.  Mr. Jarrett met personally with Ms. Savage and agreed that he had signed his written statement and the information in the statement was correct.  Mr. Jarrett told Ms. Savage that he had purchased "pink pills" which were prescription painkillers from the plaintiff and from Mr. Sayre.  (ECF No. 40-7, at 2.)  Ms. Savage also met personally with Messrs. Sayre and Ambriz; she spoke by telephone with Mr. Lamb.  Each man confirmed the substance of his respective statement.

Ms. Savage met with the plaintiff; he denied that he sold pills to Sayre or Lamb.  At her request, the plaintiff provided a statement which reads, in pertinent part, as follows:

---

[2] Vaughn Jarrett's statement is written in handwriting which is markedly different from his signature.

4

> Out of all this "I am being accused of selling pills to Dave Sayre and Todd Lamb". I have never sold nor given anything to these two individuals. In the past, not thinking of any consciences [sic], I gave Vaughn Jarret [sic] a couple of pills for his back pain at no charged [sic]. /s/ Chris Saldivar

(ECF No. 40-7, at 16.)

AVI decided to terminate the plaintiff, Ambriz, Jarrett, Lamb and Sayre because AVI "believed that each individual engaged in the unlawful distribution of prescription pain medications at AVI's WVSU account." *Id.* at 3. Mr. Lamb resigned before he was notified of the termination. *Id.* The Separation Reports are found at ECF No. 40-7, at 17-31. Messrs. Jarrett, Lamb and Sayre are Caucasian. *Id.* at 4.

The plaintiff asserts that there are genuine issues of material fact in that he disputes the truth of the statements. (ECF No. 45, at 1-4.) He points out that they are not notarized and were not given under oath. *Id.*, at 1. The plaintiff claims that Mr. Jarrett's statement was coerced, and filed an affidavit from Mr. Jarrett as follows:

> I, Vaughn Jarrett am stating regarding the matter of my statement from the WVSU Campus Police regarding Chris R. Saldivar that statement was falsified. The statement was not written by me, nor did I know what was in it. "I was told by an officer to sign it or I was going to jail." I have never bought or received any prescription pills from Chris R. Saldivar at any time. /s/ Vaughn Jarrett

(ECF No. 45-1, at 1.) The court notes that the plaintiff admitted to distributing pills to Jarrett, but Jarrett has now denied receiving any pills from the plaintiff. The plaintiff submitted an affidavit which states that the pills were Advil. *Id.* at 2. The plaintiff denies that he was ever prescribed Vicodin or Lortabs. *Id.* AVI obtained the plaintiff's prescription records which indicate that he filled prescriptions for 390 pain pills in February, 2010, including multiple prescriptions for Lortab. (ECF No. 41, at 4 n.4.)

The plaintiff does not dispute that the statements were given to Chief Saunders and to AVI. (ECF No. 40-3, at 206-07.) During his deposition, the plaintiff stated

5

repeatedly that the statements were hearsay. *Id.*, at 191, 198, 204, 206. When asked if he had "any reason to think that AVI did not honestly believe that [the plaintiff] distributed prescription pain medication at West Virginia State University," the plaintiff answered: "I don't know, but I just wish that Ms. Savage would have did a more complete investigation." *Id.* at 219.

## Summary Judgment Standard of Review

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable factfinder could return a verdict for the non-movant. *Id.* The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. *Id.* at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party

6

opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Employment Discrimination Claim

The elements of the plaintiff's employment discrimination claim are that he must show that (1) he is a member of a protected class, (2) he performed his job in a satisfactory manner, (3) he suffered an adverse employment action, and (4) he was treated differently from similarly situated employees outside the protected class. *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). AVI does not contest the first three elements; AVI asserts that it is entitled to judgment as a matter of law because it treated the similarly situated Caucasian employees the same as it treated the plaintiff. (ECF No. 41, at 14.)

The plaintiff's response (ECF No. 45) to AVI's memorandum in support of its Motion for Summary Judgment does not address this point. He cannot and does not dispute that Messrs. Jarrett and Sayre were terminated and that Mr. Lamb would have been terminated but for his precipitous resignation.

The plaintiff's original Complaint alleges that "although he was innocent, [AVI] has treated white employees who committed more serious infractions with the option of transferring to another location." (ECF No. 1-1, at 5.) In his Amended Complaint, the plaintiff repeated the allegation. (ECF No. 18, at 2.) During the plaintiff's deposition, he testified that two Caucasian employees who had been accused of sexual harassment were transferred but not terminated. (ECF No. 40-3, at 258-64.) The plaintiff failed to

provide any direct evidence that the alleged sexual harassment was "more serious" than prescription drug distribution, or that the incidents involving the two Caucasian employees would indicate that they were "similarly situated" to him.

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to show that he was treated differently from similarly situated employees outside the protected class. Because he has failed to prove one of the essential elements of his employment discrimination claim, and because there is no genuine issue as to any material fact regarding the treatment of the similarly situated Caucasian employees, AVI is entitled to judgment as a matter of law.

It should not be necessary to proceed with further analysis of the plaintiff's employment discrimination claim. However, if the presiding District Judge were to find that the plaintiff has made a *prima facie* case of discrimination, the burden of proof shifts to AVI to state its legitimate, non-discriminatory reason for terminating him. The undersigned proposes that the presiding District Judge **FIND** that the declaration of Deborah Savage establishes such a reason: "we terminated his employment because three co-workers implicated him in the unlawful distribution of prescription pain medication at AVI's WVSU account. I had no reason to disbelieve the statements of Mr. Jarrett, Mr. Lamb, and Mr. Sayre." (ECF No. 40-7, at 4.) While it is true that the statements are unsworn and hearsay, they nonetheless provided a legitimate, non-discriminatory reason to terminate the plaintiff's employment.

Tortious Interference Claim

In his original Complaint, the plaintiff alleged that he "was defamed in his character and reputation and stigmatized as a drug dealer [which] has impacted upon his mental and emotional state of being. Said defamation [h]as interfered in his ability

to gain meaningful employment." (ECF No. 1-1, at 6.) In his "Motion to Amend Complaint," the plaintiff indicated that he wanted to add a claim for tortious interference with employment opportunities, and alleged that "[o]n more than one occasion, plaintiff has been denied employment based upon the negative feedback to potential employers, slandering plaintiff's good name and reputation." (ECF No. 7, at 1.) His Amended Complaint makes the following allegations:

> 16. [AVI] has and continues to tortuously interfere with complainant's employment opportunities.
> 17. [AVI] has on more than one occasion provided negative references to potential employees.
> 18. Complainant has been denied employment as a result of the negative references provided by the respondent.
> 19. In October 2010, Complainant was being considered for a position at West Virginia State University and was assured of the position prior to having a negative reference submitted by the respondent.
> 20. As a result of the negative reference, complainant was informed that the information received labeled complainant as being involved with illegal drugs.
> 21. Again in November 2010, complainant was denied employment based upon negative information supplied to the potential employer which indicated that he was involved in drug deliveries.
> 22. Complainant states the defendant has tortuously interfered with his expectancy of gainful employment within his qualifications.

(ECF No. 18, at 2-3.)

The elements of a tortious interference claim are that a plaintiff must prove (1) the existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages. Syl. Pt. 5, *Hatfield v. Health Mgt. Assoc. of West Virginia, Inc.*, 672 S.E.2d 395 (W. Va. 2008).

AVI contends that the plaintiff has failed to prove the existence of a contractual or business relationship or expectancy. (ECF No. 41, at 16.) The two prospective employers were Taco Bell and sports coaches at WVSU. In neither instance was any

9

offer placed in writing. (ECF No. 40-3, at 243.) The plaintiff failed to address this claim in his response to AVI's Motion for Summary Judgment.

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to show that he had a contractual or business relationship or expectancy with any prospective employer. Because he has failed to prove one of the essential elements of his tortious interference claim, and because there is no genuine issue as to any material fact regarding the lack of a contractual or business relationship or expectancy with any prospective employer, AVI is entitled to judgment as a matter of law.

## Defamation Claim

The plaintiff's Amended Complaint alleges that he was "defamed in his character and reputation as a result of [AVI's] actions." (ECF No. 18, at 3.) During his deposition, the plaintiff testified that he was defamed by "the wrongful termination as a whole. And then with the media coming in after and, * * * it just kept on and kept on, kept on." (ECF No. 40-3, at 249.) He stated that he did not know of AVI telling anyone, including anyone from the media, about the termination. *Id.,* at 250. When questioned repeatedly as to whether anyone at AVI made statements that were defamatory or false about the plaintiff to anyone outside of AVI, the plaintiff mentioned only one: that Betty Spencer told Jeri Dickerson that Rod Martin told Betty "all the bad things that Chris was doing." *Id.* at 251-53.

The elements of a defamation claim are: (1) a defamatory statement; (2) a nonprivileged publication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury. Syl. Pt. 1, *Crump v. Beckley Newspapers, Inc.,* 320 S.E.2d 70 (W. Va. 1984). As pointed out by AVI, the

plaintiff has failed to identify a single allegedly defamatory statement made by anyone at AVI about him. (ECF No. 41, at 23.) Moreover, the plaintiff did not address his defamation claim in his response to AVI's Motion for Summary Judgment.

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to prove that anyone at AVI made a defamatory statement to any third party about the plaintiff which was false. Because he has failed to prove one of the essential elements of his defamation claim, and because there is no genuine issue as to any material fact regarding the lack of a defamatory statement by AVI about the plaintiff, AVI is entitled to judgment as a matter of law.

Recommendation

It is respectfully **RECOMMENDED** that the defendant's Motion for Summary Judgment (ECF No. 40) be granted and this action dismissed with prejudice.

Notice

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of

Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation, to transmit it to counsel of record, and to mail a copy of the same to the plaintiff.

<u>August 15, 2012</u>

Mary E. Stanley
United States Magistrate Judge